## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE PROTECT DEMOCRACY PROJECT,
INC.

          *Plaintiff,*

    v.                             Civil Action No. 17-CI-1000-CKK

U.S. NATIONAL SECURITY AGENCY,

          *Defendant.*

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Michael P. Abate
  (DDC Bar No. MD28077)
  (DC Bar No. 1023343)
Kaplan Johnson Abate & Bird LLP
710 W. Main St., 4th Floor
Louisville, KY 40202

Benjamin L. Berwick (MA Bar No. 679207)
Counsel
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
Phone: 202-599-0466
Fax: 929-777-8428

*Counsel for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 2

    I.   Factual Background ................................................................................................. 2

       A.  The Russia Investigation ............................................................................... 2

       B.  The President Fires Director Comey............................................................... 4

       C.  The President Asks the NSA Director and Director of National Intelligence to Dispute Any Suggestion of Collusion Between His Campaign and Russia. ......................... 6

    II.  Procedural Background ......................................................................................... 8

LEGAL STANDARD .......................................................................................................... 9

    I.   The *Glomar* Doctrine............................................................................................ 9

    II.  Summary Judgment in FOIA Cases ................................................................. 10

ARGUMENT ........................................................................................................................ 11

    I.   The *Glomar* Doctrine Does Not Permit the NSA to Refuse to Confirm the Mere Existence of a Memorandum Documenting the President's Inappropriate Attempt to Use the NSA for His Own Personal Benefit. ................................................ 12

    II.  Even if Exemption 3 Justifies Withholding Some Information, It Does Not Justify the Agency's Decision to Withhold the Requested Documents In Full. ................. 18

CONCLUSION..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

* *ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013)  .............................................................. 13, 18

*All Party Parliamentary Grp. On Extraordinary Rendition v. Dep't of Defense*,
    134 F. Supp. 3d 201 (D.D.C. 2015) ................................................................................. 16

*Am. Jewish Cong. v. Kreps*, 574 F.2d 624 (D.C. Cir. 1978) ............................................. 15

*Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55 (D.C. Cir. 2003) ...................... 10

*Carter v. NSA*, 962 F. Supp. 2d 130 (D.D.C. 2013) .......................................................... 16

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ............................................................... 10

*Elec. Privacy Info. Ctr. v. National Security Agency*, 678 F.3d 926 (D.C. Cir. 2012) ........................ 10, 12, 16

*FBI v. Abramson*, 456 U.S. 615 (1982) .............................................................................. 10

* *Founding Church of Scientology v. NSA*, 610 F.2d 824 (D.C. Cir. 1979) ...................... 14, 15, 20

*Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d. 3 (D.D.C. 1998) ........................... 10

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) .............................................................. 16

*Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009) ................................................... 16

*Linder v. NSA*, 94 F.3d 693 (D.C. Cir. 2006) .................................................................... 16

* *Lindsey v. Fed. Bureau of Investigation*, 271 F. Supp. 3d 1 (D.D.C. 2017) ................... 9, 10, 13

*Milner v. Dep't of the Navy*, 562 U.S. 562 (2011) ............................................................. 10

*Moore v. Bush*, 601 F. Supp. 2d 6 (D.D.C. 2009) .............................................................. 16

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ................................................................ 13

*Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224 (D.C. Cir. 2008) ........................ 10

*National Archives & Records Administration v. Favish*, 541 U.S. 157 (2004) ................ 17

*National Ass'n of Gov't Employees v. Campbell*, 593 F.2d 1023 (D.C. Cir. 1978) ........... 10

*People for the Amer. Way Found. v. NSA/Cent. Sec. Serv.*, 462 F. Supp. 2d 21 (D.D.C. 2006) ................... 16

*Cases upon which we chiefly rely are marked with asterisks*

* *Phillipi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) .......................................................................13

*Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898 (D.C. Cir. 1999) ......11

*Roth v. U.S. Dep't of Justice*, 642 F.3d 1161 (D.C. Cir. 2011)................................................ 12, 13

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008)..........................19

*Terkel v. AT&T Corp.*, 441 F.Supp.2d 899 (N.D. Ill. 2006) ...........................................................16

*Wheeler v. Exec. Office of United States Attys.*, 2008 WL 178451 (D.D.C. Jan. 17, 2008) ...........13

*Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) ....................................................................................16

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ............................................................................ 10, 12

**Statutes**

5 U.S.C. § 552(a)(4)(B) ...................................................................................................................10

5 U.S.C. § 552(b) .............................................................................................................................18

50 U.S.C. § 3605..............................................................................................................................18

**Other**

Adam Entous & Ellen Nakashima, *Trump asked intelligence chiefs to push back against FBI collusion probe after Comey revealed its existence,* Washington Post (May 22, 2017) ....................................6

Rachel Maddow, *Exclusive: Handwritten notes appear to back Comey claims on Trump,* MSNBC (Mar. 30, 2018) .............................................................................................................5

Miles Parks, *Russian Threat To Elections To Persist Through 2018, Spy Bosses Warn Congress,* NPR (Feb. 13, 2018) ..............................................................................................................2

Matthew Rosenberg, Emmarie Huetteman & Michael S. Schmidt, *Comey Confirms F.B.I. Inquiry on Russia; Sees No Evidence of Wiretapping,* N.Y. Times (Mar. 20, 2017) ....................................3

Del Quentin Wilber, Shane Harris and Paul Sonne, *Mueller Probe Examining Whether Donald Trump Obstructed Justice,* The Wall Street Journal (June 15, 2017)..........................................7

---

*\* Cases upon which we chiefly rely are marked with asterisks*

**INTRODUCTION**

Plaintiff The Protect Democracy Project, Inc. (hereinafter "Protect Democracy") moves this Court to grant it summary judgment against Defendant National Security Agency ("NSA"). As described in more detail below, the parties negotiated to narrow the scope of the initial FOIA request to a small universe: a memorandum reportedly created by senior NSA personnel after President Trump called Admiral Michael Rogers, who was at the time the Director of the NSA, and asked him to publicly dispute any suggestion of coordination between the Trump campaign and Russia. According to various news reports, NSA personnel created this memo to document the unusual, unsolicited, and entirely inappropriate attempt by the President of the United States to use the NSA to undermine an ongoing FBI investigation for his own personal benefit.

Although the NSA agreed to narrow the scope of its production obligation to this memo (as well as any other documents transmitting or referencing it), the agency now asserts a "*Glomar*" response—that is, it contends that it can neither confirm nor deny the existence of the memo without revealing the functions or activities of the NSA. That assertion is implausible and cannot be accepted by this Court.

A *Glomar* response is appropriate only where confirmation or denial of the existence of records would, itself, reveal information that is exempted from disclosure by statute. Here, NSA would reveal nothing about its own functions or activities by disclosing whether the requested memorandum exists. It simply would reveal whether the President of the United States attempted to use the NSA to undermine the FBI's ongoing investigation for his own personal benefit—a request so inappropriate and outside the Agency's mission that the NSA Director rebuffed the President and, along with senior agency officials, immediately documented the inappropriate conduct (as other senior officials have done in analogous contexts).

The NSA's contrary assertion is far too conclusory to justify a *Glomar* response. The NSA

does not even attempt to explain how the mere existence of the requested memorandum would reveal the kind of information courts have found to be protected by Section 6 of the National Security Act, such as information related to signals intelligence, vulnerability assessments, surveillance targets, or intelligence sources and methods.

Moreover, *Glomar* should not be used to cover up credible allegations of wrongdoing by government officials—even by the President of the United States. Yet, that is precisely what the NSA appears to be doing here.

The NSA must acknowledge (or deny) the existence of the requested documents and release all reasonably segregable portions that do not disclose the actual intelligence activities *of the NSA*. It cannot hide behind FOIA to avoid admitting that the documents exist, or to withhold any discussion of inappropriate conduct by the President of the United States. At a minimum, this Court should review the requested document(s) *in camera* to determine whether any portions may be publicly released.

## BACKGROUND

**I.     Factual Background**

**A.     The Russia Investigation**

It is the unanimous view of the U.S. Intelligence Community that Russia took measures to interfere in the 2016 U.S. elections on behalf of then-candidate Trump. *See* Plaintiff's Statement of Undisputed Material Facts ("SUMF") ¶ 1 & Exh. 1 (Intelligence Community Assessment, Assessing Russian Activities and Intentions in Recent US Elections (Jan. 6, 2017)); *see also, e.g.*, Miles Parks, *Russian Threat To Elections To Persist Through 2018, Spy Bosses Warn Congress*, NPR (Feb. 13, 2018).[1] Specifically, the Intelligence Community Assessment concluded that "[Russian President Vladimir] Putin ordered an influence campaign in 2016 aimed at the US presidential election"; that "Russia's

---

[1] *Available at* https://n.pr/2EE0sMC (last visited June 21, 2018).

goals were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency"; and that "Putin and the Russian Government developed a clear preference for President-elect Trump." The Intelligence Community expressed "high confidence in these judgments." SUMF ¶ 2.

On March 20, 2017, James Comey, who at the time was the Director of the Federal Bureau of Investigation ("FBI"), and Admiral Michael Rogers, who was the Director of the National Security Agency ("NSA"), testified in a public hearing before the House Permanent Select Committee on Intelligence. *See* SUMF, Exh. 2 (Hearing Transcript). At that hearing, Director Comey revealed publicly, for the first time, that the FBI began investigating Russian interference in the election in July 2016, and that the investigation included possible collusion with the Trump campaign. *See* SUMF ¶¶ 4-5 & Exh. 2; *see also, e.g.*, Matthew Rosenberg, Emmarie Huetteman & Michael S. Schmidt, *Comey Confirms F.B.I. Inquiry on Russia; Sees No Evidence of Wiretapping*, N.Y. TIMES (Mar. 20, 2017).[2] At the hearing, Director Comey stated:

> I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

SUMF ¶ 4.[3]

NSA Director Rogers appeared alongside Director Comey at the hearing. Adm. Rogers confirmed publicly that the NSA had first discovered Russian attempts to influence the election and

---

[2] *Available at* https://nyti.ms/2mHIFLP (last visited June 21, 2018).

[3] A copy of the full transcript of the hearing is reprinted at https://wapo.st/2v2AMKk (last visited June 21, 2018). No official transcript of the hearing is available either on the House Intelligence Committee's or the Government Printing Office's websites.

had passed that information along to their "FBI teammates," because the NSA does not investigate

domestic political issues. SUMF ¶ 7 & Exh. 2, p. 114.

     **B.**     **The President Fires Director Comey.**

     Less than two months later, the President fired Director Comey. SUMF ¶ 8. Two days later,

in an interview with NBC News's Lester Holt, President Trump stated that he was thinking about

"this Russia thing with Trump," which he called "a made up story," when he decided to fire

Director Comey. SUMF ¶ 9. The President made that decision before receiving a recommendation

on the matter from his Attorney General or Deputy Attorney General. SUMF ¶ 10. After the

President fired Director Comey, the Deputy Attorney General appointed a Special Counsel Robert

Mueller to continue the investigation. SUMF ¶ 11 & Exh. 3 (Order No. 3915-2017, Appointment of

Special Counsel to Investigate Russian Interference with the 2016 Presidential Election & Related

Matters (May 17, 2017)).

     Following his termination, Mr. Comey testified in open session before the Senate Select

Committee on Intelligence. SUMF ¶ 12 & Exh. 4 (Official Hearing Transcript). In his prepared

remarks for the Senate Committee (attached to the SUMF as Exh. 5), Mr. Comey revealed several

remarkable actions by the President that bear directly on the issues in this case.

     *First*, Mr. Comey detailed several inappropriate requests from the President intended to

frustrate or curtail the ongoing Russia investigation. For example, the President invited Mr. Comey

to the White House for a one-on-one dinner exactly one week after being sworn into office, and

repeatedly asked Mr. Comey to pledge his loyalty to the President. *See* SUMF ¶ 15 & Exh. 5, at 3-4.

     In another troubling episode on February 14, 2017, the President asked then-Director

Comey to remain behind alone in the Oval Office following a counter-terrorism briefing. SUMF

¶ 16. The President asked all others present in the room to leave, including Attorney General Jeff

Sessions, Comey's boss. SUMF ¶ 17. Once alone, President Trump asked Director Comey to drop

his investigation into Michael Flynn, the former National Security Adviser who had just resigned from his position. SUMF ¶ 18. Director Comey regarded this request as "very concerning, given the FBI's role as an independent investigative agency." SUMF ¶ 20 & Exh. 5, at 5. He and his senior staff agreed "that it was important not to infect the investigative team with the President's request, which we did not intend to abide." SUMF ¶ 21

Shortly after the February 14, 2017 Oval Office meeting, then-Director Comey spoke to the Attorney General Sessions about his one-on-one meeting with the President. SUMF ¶ 22. He "implore[d] the Attorney General to prevent any future direct communication between the President and me." *Id.* & Exh. 5 at 6. Mr. Comey "told the AG that what had just happened – him being asked to leave while the FBI Director, who reports to the AG, remained behind – was inappropriate and should never happen." SUMF ¶ 23. The Attorney General "did not reply." SUMF ¶ 24.

Another troubling incident occurred on March 30, 2017, when the President called then-Director Comey at the FBI headquarters. SUMF ¶ 25. During that call he asked Director Comey what he could do to "lift the cloud" of the Russia investigation and repeatedly encouraged then-Director Comey to publicly state that the FBI was not personally investigating the President. SUMF ¶ 26. "Immediately after that conversation" Director Comey "called Acting Deputy Attorney General Dana Boente (AG Sessions had by then recused himself on all Russia-related matters), to report the substance of the call from the President." SUMF ¶ 27 & Exh. 5, at 7. Director Comey told the Acting Deputy AG that he "would await [his] guidance." *Id.*[4]

Before Director Comey heard back from the Acting Deputy Attorney General, the President called him again on April 11, 2017 "and asked what I had done about his request that I 'get out' that

---

[4] MSNBC has since published copies of handwritten notes apparently taken by the Acting Deputy AG during that phone call with Dir. Comey on March 30, 2017. *See* Rachel Maddow, *Exclusive: Handwritten notes appear to back Comey claims on Trump*, https://on.msnbc.com/2HbO2RH (last visited June 21, 2018). Those notes corroborate Director Comey's Senate testimony.

he is not personally under investigation." SUMF ¶ 28. Director Comey "replied that I had passed his

request to the Acting Deputy Attorney General, but I had not heard back." SUMF ¶ 29. The

President "replied that 'the cloud' was getting in the way of his ability to do his job. He said that

perhaps he would have his people reach out to the Acting Deputy Attorney General." SUMF ¶ 30.

That was the last time Director Comey spoke to the President before the President fired him on

May 9, 2017. SUMF ¶ 31.

*Second*, Mr. Comey's testimony illustrated that these requests were so unusual and

inappropriate he "felt compelled to document [his] first conversation with the President-Elect in a

memo." SUMF ¶ 13 & Exh. 5, at 2. Indeed, "Creating written records immediately after one-on-one

conversations with Mr. Trump was my practice from that point forward." *Id.*; *see also* SUMF ¶ 19

(after the February 14, 2017 Oval Office meeting, Director Comey "immediately prepared an

unclassified memo of the conversation about Flynn and discussed the matter with FBI senior

leadership" (citing SUMF, Exh. 5, at 5)).

As explained below, the President made similarly inappropriate requests of the NSA

Director and Director of National Intelligence. And, as relevant here, NSA personnel, like Director

Comey, felt compelled to document that usual request in the document(s) at issue in this FOIA

request.

### C. The President Asks the NSA Director and Director of National Intelligence to Dispute Any Suggestion of Collusion Between His Campaign and Russia.

On May 22, 2017, the Washington Post ran a story by reporters Adam Entous & Ellen

Nakashima entitled *Trump asked intelligence chiefs to push back against FBI collusion probe after Comey revealed*

*its existence.* SUMF ¶ 32 & Exh. 6. According to the Post's reporting, President Trump contacted the

Director of National Intelligence Daniel Coats and NSA Director Admiral Michael S. Rogers shortly

after the House Intelligence Committee's March 20, 2017 hearing and asked each official "to help

him push back against an FBI investigation into possible coordination between his campaign and the

Russian government." SUMF ¶ 33. Those calls come only days before the March 30, 2017 call from the President to Director Comey, noted above, in which the President asked him to publicly state he was not a subject or target of the FBI's investigation.

Citing conversations with two current and two former officials, the Post reported that "Coats and Rogers refused to comply with the requests, which they both deemed to be inappropriate." SUMF ¶ 34. The Post also noted that "[i]n his call with Rogers, Trump urged the NSA director to speak out publicly if there was no evidence of collusion, according to officials briefed on the exchange." SUMF ¶ 35. "Rogers was taken aback but tried to respectfully explain why he could not do so, the officials said." *Id.* "For one thing, he could not comment on an ongoing investigation." *Id.* "Rogers added that he would not talk about classified matters in public." *Id.*

Crucially for this case, the Post also reported that "Trump's conversation with Rogers was documented contemporaneously in an internal memo written by a senior NSA official." SUMF ¶ 36. According to the Post, "Current and former senior intelligence officials viewed Trump's requests as an attempt by the president to tarnish the credibility of the agency leading the Russia investigation." SUMF ¶ 37.

Shortly thereafter, The Wall Street Journal reported that the author of the memo was Rick Ledgett, the former Deputy Director of the NSA. SUMF ¶ 38 & Exh. 7 (Del Quentin Wilber, Shane Harris and Paul Sonne, *Mueller Probe Examining Whether Donald Trump Obstructed Justice*, THE WALL STREET JOURNAL (June 15, 2017)). The WSJ stated that "[w]hile Mr. Ledgett was still in office, he wrote a memo documenting a phone call that Mr. Rogers had with Mr. Trump," in which "the president questioned the veracity of the intelligence community's judgment that Russia had interfered with the election and tried to persuade Mr. Rogers to say there was no evidence of collusion between his campaign and Russian officials." SUMF ¶ 40. The WSJ also noted that the

Special Counsel investigating possible connections between Russia and the Trump campaign planned to interview Mr. Ledgett. SUMF ¶ 41.

The WSJ also noted that both DNI Coats and Adm. Rogers testified at a June 7, 2017 Senate Intelligence Committee Hearing. SUMF ¶ 42 & Exh. 8 (Hearing Transcript). Neither official would publicly confirm or deny the reports that the President had placed the phone call in question, but each expressed a willingness to testify before the Special Prosecutor about the matter if requested. *Id.*

## II.    Procedural Background

On April 21, 2017, Plaintiff sent a FOIA request to the NSA seeking several categories of documents related to Russian interference in the 2016 election and contacts between the Trump Campaign and Russian agents. SUMF ¶ 43 & Exh. 9. Among other things, that FOIA Request sought:

> All records, including but not limited to emails, notes, and memoranda, reflecting, discussing, or otherwise relating to communications between the National Security Agency and the Executive Office of the President regarding contacts between individuals connected with the Russian government and individuals connected with the Trump campaign or the Trump administration, and/or Russian involvement with, or attempts to influence or interfere with, the national election of November 2016.

SUMF ¶ 44. When Plaintiff did not receive documents within the timeframe required by FOIA, it initiated this litigation. SUMF ¶ 45; *see also* Compl., ECF No. 1. Plaintiff amended that complaint on August 7, 2017 to add additional defendants. SUMF ¶ 46; *see also* Am. Compl., ECF No. 12.[5]

On October 25, 2017, the parties reached an agreement on the schedule for the production of documents, whereby the NSA would produce all non-exempt responsive records over the course of three productions—on December 13, 2017; March 13, 2018; and May 13, 2018.  SUMF ¶ 47. On

---

[5] To simplify this case and allow the parties to expedite briefing on this Motion, the parties jointly moved the Court to dismiss the Department of Justice and Office of Director of National Intelligence as Defendants. This Court granted that motion on June 20, 2018. *See* ECF No. 21.

December 20, 2017, NSA produced a single page of responsive documents to Plaintiffs in its initial production, which was redacted in part. SUMF ¶ 48 & Exh. 10.

In order to expedite the processing and production of responsive records, Plaintiff proposed to the NSA that it would be willing to narrow the request to "any memoranda (and . . . associated documents) written by senior NSA officials documenting a conversation between White House personnel, including the President, and NSA senior officials, including Adm. Rogers, in which the White House asked the NSA to publicly dispute any suggestion of collusion between Russia and the Trump campaign."  SUMF ¶ 49 & Exh. 11. Plaintiff went on to explain that the proposed narrowed request would include:

> any records documenting or referencing any such phone call between the President (or senior advisers) and Adm. Rogers (or senior advisers).  This includes, but is not limited to, the above-referenced memoranda; any communications forwarding, responding to, or discussing that memoranda; or any other document describing any conversations in which White House officials asked NSA officials to publicly dispute the suggestion of any collusion between Russia or Russian nationals and the Trump campaign.

SUMF ¶ 50.

By letter dated March 20, 2018, the NSA accepted the proposed narrowing. SUMF ¶ 51 & Exh. 12. The agency issued a "*Glomar*" response—that is, it refused to confirm or deny the existence of the requested documents.  SUMF ¶ 52. NSA's letter asserted that "the fact of the existence or non-existence of the materials . . . is protected from disclosure by" 50 U.S.C. § 3605 because it "would reveal information concerning NSA's core mission, function, and activities." SUMF ¶ 53.

## LEGAL STANDARD

### I.    The *Glomar* Doctrine

"A *Glomar* response 'is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption.'" *Lindsey v. Fed. Bureau of Investigation*, 271 F. Supp. 3d 1 (D.D.C.

2017) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). To prevail on a *Glomar* assertion, the NSA must prove by affidavit or testimony that the confirmation or denial of the existence of a document would, itself, fall within one of the FOIA exemptions. *See Elec. Privacy Info. Ctr. v. National Security Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012) (hereinafter, "*EPIC*"). The Agency's arguments concerning its inability to confirm the mere existence of a record must be "logical" or "plausible." *Lindsey*, 271 F. Supp. 3d at 5 (quotation marks and citation omitted). The NSA must support its *Glomar* assertion with "'reasonable specificity of detail rather than merely conclusory statements.'" *Id.* at 4 (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008)). Moreover, a *Glomar* response should not be credited where the Government's basic claims are "called into question by contradictory evidence in the record or by evidence of agency bad faith." *Id.*

## II.      Summary Judgment in FOIA Cases

Summary judgment is appropriate when the record demonstrates that there is no genuine issue as to any material fact, and the moving party demonstrates it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. In a FOIA cases, summary judgment for the government is appropriate only where "the agency proves that it has fully discharged its obligations under FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Greenberg v. U.S. Dep't of Treasury*, 10 F. Supp. 2d. 3, 11 (D.D.C. 1998).

Federal courts review de novo agencies' withholding of materials that they claim are exempt under FOIA. 5 U.S.C. § 552(a)(4)(B). FOIA exemptions must be narrowly construed. *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  The agency "bears the burden of establishing the applicability of the claimed exemption." *Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003). This burden does not shift even when the requester files

for summary judgment because "the Government 'ultimately [has] the onus of proving that the

[documents] are exempt from disclosure.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*,

185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *National Ass'n of Gov't Employees v. Campbell*, 593 F.2d

1023, 1027 (D.C. Cir. 1978)).[6]

## ARGUMENT

NSA's *Glomar* assertion should be rejected by this Court. *Glomar* may only be invoked where

confirming the mere existence or nonexistence of the records would reveal information that may

validly be withheld under FOIA. Here, the NSA claims that even producing a *Vaughn* Index would

disclose the organization, function, or activities of the NSA, which may be withheld under Section 6

of the National Security Act and Exemption 3 of FOIA. That claim is meritless; the records sought

do not pertain to activities of the NSA, but rather to the inappropriate activities of the President,

who attempted—unsuccessfully—to use the NSA to publicly undermine the FBI for his personal

benefit. NSA officials rejected that request, and documented it in the memo at issue here, *precisely

because* it was not part of the agency's proper mission or function.

NSA's attempt to invoke *Glomar* also fails for the additional reason that it is too conclusory.

NSA has not even attempted to explain how revealing (or denying) the existence of a memo

documenting an unsolicited call from the President of the United States asking the NSA to alleviate

domestic, political pressure on his Administration would disclose the kind of information courts

have found Section 6 to cover: signals intelligence capabilities, vulnerabilities assessments,

intelligence targets, or intelligence sources and methods. Nor could it, because there is no logical

connection between the President's inappropriate request and the NSA's mission.

---

[6] Typically, the agency seeking to withhold the records would file for summary judgment first, and submit a *Vaughn* Index explaining the exemption(s) it is invoking. Here, however, the NSA has made clear it will not be producing a *Vaughn* Index in light of its *Glomar* claim. *See* SUMF, Exh. 12, p.2. Thus, the validity of the *Glomar* claim is fully ripe for review at this time.

NSA's *Glomar* assertion also fails because that doctrine cannot be used to try to cover up wrongdoing by government officials when a reasonable person would conclude from the available evidence that such wrongdoing might have occurred. Yet that is precisely what the NSA is trying to do here, by asserting a *Glomar* claim over information that would confirm what seems obvious from the public record: the President attempted to publicly pit the NSA (and ODNI) against the FBI for his personal benefit.

Finally, even if there were some exempt material in the NSA memo, the agency has an obligation to redact only that information and produce the rest. After rejecting the NSA's *Glomar* assertion, this Court should require the NSA to justify any specific redactions in the memo that might be justified by Exemption 3 with a proper *Vaughn* Index, conducting *in camera* review of the documents if necessary.

I.     **The *Glomar* Doctrine Does Not Permit the NSA to Refuse to Confirm the Mere Existence of a Memorandum Documenting the President's Inappropriate Attempt to Use the NSA for His Own Personal Benefit.**

The NSA's *Glomar* response is inappropriate as a matter of law. *Glomar* may not be invoked merely because an agency believes that a document might ultimately be exempt from disclosure under FOIA. Rather, "[b]ecause *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (internal citation omitted) (quoting *Wolf*, 473 F.3d at 374). The agency invoking *Glomar* bears the burden of making that showing. *EPIC*, 678 F.3d at 931.

Courts have not hesitated to reject *Glomar* assertions where the agency's contentions are neither logical nor plausible, or where the agency makes only a cursory assertion of the need for

non-disclosure of the existence of the records. *See, e.g., ACLU v. CIA*, 710 F.3d 422, 428 (D.C. Cir.

2013) (rejecting *Glomar* assertion concerning existence of records related to drone strikes); *Roth*, 642

F.3d at 1181 (rejecting FBI's *Glomar* assertion related to records of individuals allegedly involved in a

criminal investigation); *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (rejecting CIA's cursory

*Glomar* assertion); *Phillipi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976) (remanding to district court

to develop a public record on the need for a *Glomar* response). This Court, likewise, has rejected

*Glomar* assertions as insufficient. Just last year, this Court rejected a *Glomar* assertion by the FBI for

being too conclusory and failing to give adequate consideration to whether the third party who was

the subject of the request had made public statements that rendered the *Glomar* response

inappropriate. *See Lindsey*, 271 F. Supp. 3d at 1. Likewise, in *Wheeler v. Exec. Office of United States

Attys.*, 2008 WL 178451 (D.D.C. Jan. 17, 2008), this Court ordered the Government to provide a

detailed justification for its otherwise unexplained *Glomar* response, at which point the Government

abandoned that claim.

   The information provided by the NSA to date is similarly too conclusory to support a

*Glomar* assertion. In relevant part, the NSA's letter simply states:

> NSA has determined that the fact of the existence or non-existence of the materials
> you request is protected from disclosure by statute. An affirmative or negative
> response to the Second Amended Request would reveal information concerning
> NSA's core mission, function, and activities that is exempt from disclosure pursuant
> to the third exemption of FOIA, which provides for the withholding of information
> specifically protected from disclosure by statute. The Specific statute applicable in this
> case is Section 6, Public Law 86-36 (50 U.S. Code 3605), a statutory privilege unique
> to NSA, which protects from disclosure information concerning these very core
> functions and activities. Thus, your Second Amended Request is denied because the
> fact of the existence or non-existence of the information sought is exempted from
> disclosure pursuant to the third exemption.

SUMF, Exh. 10, p. 2. Distilled to its essence, the NSA is really claiming that confirming whether an

NSA official wrote a memo to document an inappropriate phone call from the President would

somehow disclose "the organization or any function of the National Security Agency, or any

information with respect to the activities thereof," in violation of Section 6 of the National Security Act, 50 U.S.C. § 3605(a).[7] That assertion is puzzling.

As in *Founding Church of Scientology v. NSA*, 610 F.2d 824, 831 (D.C. Cir. 1979), this cursory invocation of NSA's Section 6 authority "fail[s] to indicate even in the slightest how agency functions might be unveiled" if the document's existence is confirmed. That silence is unsurprising, because the record(s) sought by plaintiff reveals *nothing* about the organization, function, or activities *of the National Security Agency*.

Instead, an acknowledgement of the existence of the requested documents would simply reveal the inappropriate activities *of the President of the United States*. As reported by the Washington Post and Wall Street Journal, the President called the NSA Director (and Director of National Intelligence) to demand that his agency publicly dispute the suggestion that there was any collusion between Russia and his campaign. SUMF ¶ 33. Adm. Rogers (and Director Coats) rejected that request, which he deemed inappropriate. SUMF ¶ 34. And indeed it was; publicly "tarnish[ing] the credibility of the agency leading the Russia investigation" (SUMF ¶ 37) is not one of the NSA's missions, functions, or activities. It is therefore unsurprising that senior NSA officials believed it necessary to document this unorthodox and inappropriate request in a contemporaneous memorandum. SUMF ¶ 36.

Adm. Rogers was not the only official who concluded the President's conduct and inappropriate requests ran counter to his agency's mission, of course. As detailed above, Director Comey had grave misgivings about multiple, unusual requests from the President, including his requests: for "loyalty" from the FBI Director (SUMF ¶ 15); for Comey to drop any investigation into former National Security Adviser Michael Flynn (SUMF ¶ 18); and for Comey to publicly state

---

[7] Plaintiff does not dispute that Section 6 of the Act is a valid "withholding statute" for purposes of FOIA exemption 3; it simply disputes that confirming the existence of the documents sought would reveal anything protected by that statute.

the President was not a target of the investigation (SUMF ¶¶ 26, 28). Like Adm. Rogers, Dir. Comey

found these requests to be "very concerning, given the FBI's role as an independent investigative

agency." SUMF ¶ 20; *see also id.* ¶ 23 (Dir. Comey "told the AG that what had just happened – him

being asked to leave while the FBI Director, who reports to the AG, remained behind – was

inappropriate and should never happen"). And, like NSA officials, Dir. Comey "felt compelled to

document" and/or disclose the President's inappropriate actions. SUMF ¶¶ 13, 19, 22, 27.

If there were any doubt about whether the existence of the requested memorandum would

reveal any previously undisclosed function or activity of the NSA, it is removed by the NSA

Director's own testimony at public hearings about the Russia investigation. That testimony confirms

that NSA played no role in the domestic, political aspects of the investigation. At the March 20,

2017 House Intelligence Committee hearing, Adm. Rogers stated on the public record that the NSA

first discovered Russian attempts to target the Clinton campaign in the summer of 2015, and then

"shared [that information] with our FBI teammates." SUMF, Exh. 2., p. 114. That handoff makes

perfect sense; as Adm. Rogers explained at another point in that hearing (when declining to answer a

question about whether Russian meddling altered the election results), "we are a foreign intelligence

organization, not a domestic intelligence organization." *Id.*, p. 11; *see also id.* at 120 (NSA never

sought access to the DNC's hacked computer systems because "that's not in our job" to handle

domestic investigations). Thus, NSA cannot credibly claim that intramural fighting about how to

handle an FBI Investigation bears in any way upon the NSA's own mission, function, or activities.

For these same reasons, the information sought by Plaintiff here is nothing like the

information over which Courts have allowed the NSA to assert Section 6 and/or *Glomar* claims in

the past. To be sure, courts have described the scope of Section 6 as "broad," but have nonetheless

cautioned that it must be "construed with sensitivity to the 'hazard(s) that Congress foresaw.'"

*Founding Church of Scientology*, 610 F.2d at 829 (quoting *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 629

(D.C. Cir. 1978)); *see also People for the Amer. Way Found. v. NSA/Cent. Sec. Serv.*, 462 F. Supp. 2d 21, 31 (D.D.C. 2006) (acknowledging that "Section 6 is not without limits); *Terkel v. AT&T Corp.*, 441 F.Supp.2d 899, 905 (N.D. Ill. 2006) ("We are, however, concerned that if . . . section 6 is taken to its logical conclusion, it would allow the federal government to conceal information regarding blatantly illegal or unconstitutional activities simply by . . . claiming they implicated information about the NSA's functions.").

Case law bears out that cautious approach. Courts have upheld Section 6 claims for the NSA only where the information sought truly would reveal the agency's *intelligence* activities, such as where requesters sought documents whose disclosure would reveal: the NSA's signals intelligence collection activities, *see Linder v. NSA*, 94 F.3d 693 (D.C. Cir. 2006); *Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979); *Carter v. NSA*, 962 F. Supp. 2d 130 (D.D.C. 2013) (Kollar-Kotelly, J.); the NSA's assessment about encryption and cybersecurity vulnerabilities, *EPIC*, 678 F.3d 926; undisclosed targets of NSA surveillance, *see Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009); *Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009); *Moore v. Bush*, 601 F. Supp. 2d 6 (D.D.C. 2009) (Kollar-Kotelly, J.); *People for the Amer. Way Found. v. NSA*, 462 F. Supp. 2d 21 (D.D.C. 2006); and intelligence sources, *All Party Parliamentary Grp. On Extraordinary Rendition v. Dep't of Defense*, 134 F. Supp. 3d 201 (D.D.C. 2015). Here, by contrast, revealing that the President attempted to use the NSA to undermine the work of the FBI—for his own personal benefit—would reveal nothing about the scope of the NSA's activities.

The agency's *Glomar* response is inappropriate for another reason, too: *Glomar* is not a tool to be used to cover up credible claims of wrongdoing by government officials. In *Roth*, for example, the D.C. Circuit held that the FBI could not use *Glomar* to avoid confirming or denying whether it had records concerning several drug dealers who were alleged to have committed a murder for which the FOIA requester had been convicted. The court found that the public had a compelling

interest in knowing whether the government was withholding information about the potential
innocence of a death-row inmate, and that the requester had provided evidence "that would warrant
a belief by a reasonable person that the alleged Government impropriety might have occurred."' *Id.*
at 1178 (quoting *National Archives & Records Administration v. Favish*, 541 U.S. 157, 174 (2004)). The
Court thus rejected the FBI's *Glomar* claim premised on Exemption 7(C). The NSA's *Glomar* claim is
similarly inappropriate here, where there is compelling evidence that the President, in an attempt to
hobble the Russia investigation, attempted to use the NSA to undermine the FBI. The NSA should
not be permitted to use *Glomar* as a shield against the disclosure of misconduct that attempted to
disrupt the important work of federal law enforcement and intelligence agencies.

Finally, the Agency's *Glomar* response is inconsistent with the public statements of then-
Director Admiral Rogers concerning the existence and importance of the Russia investigation. At
the March 20, 2017 House Intelligence Committee hearing, Director Rogers stated in response to a
question from Rep. LoBiondo that the best way to prevent a recurrence of Russian interference is to
have a robust public discussion about what happened during the 2016 election:

> I think a public discussion and acknowledgment of the activity is a good positive first
> step because it shines us a flashlight on this, if you will. It illuminates a significant issue
> that I think we all have to – have to deal with. There's a variety [of] ongoing efforts
> both within the government, as well, in the private sector.

SUMF, Exh. 2, at 61. Later in that same hearing, Director Rogers elaborated on this point, noting:

> The investigation we're going through I think is a positive in the sense it will help
> illuminate to all of us, regardless of party, what are the implications here and what does
> it mean for us. Because I think our conclusion and that of the intelligence community
> broadly here is, this absent some change, this behavior is not likely to stop. Absent
> some change in the dynamic, this is not likely to be the last time we'll be having these
> discussions about that kind of activity. I don't think that's in anybody's best interest
> for us as a nation.

*Id.* at 118. Thus, it makes little sense for the NSA to now claim that it can neither confirm nor deny
whether the requested memorandum exists without disclosing NSA activities or functions, when the
head of that very agency has publicly: (1) confirmed the existence of the Russia investigation;

(2) confirmed his agency's role in discovering evidence of Russian interference and providing it to the FBI in 2015; and (3) encouraged robust public disclosure and debate about Russian interference to prevent it from happening again. Indeed, such disclosures themselves can render a *Glomar* claim inappropriate. *See, e.g.*, *ACLU*, 710 F.3d at 430 ("Given these official acknowledgments that the United States has participated in drone strikes, it is neither logical nor plausible for the CIA to maintain that it would reveal anything not already in the public domain to say that the Agency at least has an intelligence interest in such strikes. . .. And it strains credulity to suggest that an agency charged with gathering intelligence affecting the national security does not have an 'intelligence interest' in drone strikes, even if that agency does not operate the drones itself." (quotation marks and citation omitted)).

Against that backdrop, the NSA's *Glomar* assertion can only be seen for what it is: an attempt at political damage control by a President who wants the Russia investigation to simply go away and has attempted—thus far unsuccessfully—to use his considerable political power to achieve that result. That is not a proper use of the *Glomar* doctrine, and should be rejected by this Court.

## II.    Even if Exemption 3 Justifies Withholding Some Information, It Does Not Justify the Agency's Decision to Withhold the Requested Documents In Full.

For reasons just explained, Section 6 of the NSA does not apply to documents that would reveal nothing more—*or less*—than the President's inappropriate attempt to use the NSA (and ODNI) to undermine the FBI's investigation for his own personal gain. Thus, the documents should be ordered released in full.

Of course, it is conceivable that even in the absence of a valid *Glomar* assertion, the NSA will claim some portion of its memorandum remains exempt under 50 U.S.C. § 3605 (and therefore may be withheld under FOIA). But if that is the case, the proper course would be for the NSA to redact only those portions of the document that are protected by statute and release the rest. *See, e.g.*, 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person

requesting such record after deletion of the portions which are exempt under this subsection.");

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[A]n agency cannot

justify withholding an entire document simply by showing that it contains some exempt material."

(internal quotation marks and citation omitted)). Indeed, that is precisely what the NSA did with

respect to the single page of records it has released to date in this case:

| From: | Automated Mass Mailer |
|---|---|
| To: | Agency All 2.0 (alias) |
| Subject: | (U/~~FOUO~~) ENTIRE ENTERPRISE: Unclassified IC Report on Russian Activities Available |
| Date: | Friday, January 06, 2017 5:02:09 PM |

Classification: UNCLASSIFIED/~~FOR OFFICIAL USE ONLY~~

(U/~~FOUO~~) From the Desk of Trumbull D. Soule, Director of Legislative, State, and Local Affairs

(U/~~FOUO~~) Yesterday, ADM Rogers joined Director of National Intelligence (DNI) James Clapper, and Undersecretary of Defense for Intelligence Marcel Lettre, in briefing the Senate Armed Services Committee on foreign cyber threats. Not surprisingly, a good many of the questions from the senators were related to the accusations of Russian attempts to interfere in the recent presidential election.

(U/~~FOUO~~) As these allegations first arose, the White House directed the Intelligence Community to investigate and report their findings. President Obama received the report on Thursday, 5 January 2017, and intelligence officials briefed President-elect Trump today, Friday, 6 January 2017. During yesterday's testimony, DNI Clapper noted that an unclassified version of the report would be released to the public, and it is now available on the DNI's Tumblr page "IC on the Record." The same report is available at the below link. Additional hearings on this issue will take place in coming weeks.

[                                    ] · · · · · · · · · · · [ (b) (3) - P.L. 86-36 ]

(U/~~FOUO~~) While employees are free to discuss information that is contained in this unclassified report, it is important to remember that this is a highly sensitive issue that has been informed by some of NSA's most critical capabilities. Our continued success in this area depends on our ability to maintain ongoing access to this type of data, so I ask each of you not to speculate on or discuss the sources and methods that informed this report. And as always, should you be approached by any member of the media seeking information, please refer them to the NSA Public Affairs Office at mediarelations@nsa.gov or at 301-688-6524.

(U/~~FOUO~~) Release Authority: Public Affairs Office, P21
(U/~~FOUO~~) POC for Message: DN1 [          ] · · · · · · · · · · · [ (b) (3) - P.L. 86-36 ]
(U/~~FOUO~~) Content Approval for Message: Trumbull Soule
(U/~~FOUO~~) Distro: ENTIRE ENTERPRISE

Classification: UNCLASSIFIED/~~FOR OFFICIAL USE ONLY~~

SUMF, Exh. 10.

Here, the NSA must, at a minimum, release any portions of the document(s) that relate or

refer to the President's inappropriate request for to the NSA to publicly undermine the FBI's

investigation or dispute any suggestion of collusion between Russia and the Trump campaign. Such material does not relate to the proper functions *of the NSA*—which is, after all, the very reason the memo exists in the first place.

If the NSA continues to assert that the entire memorandum remains exempt even without *Glomar*, this Court should review the document(s) *in camera. See Founding Church of Scientology*, 610 F.2d at 830 (where an agency's assertions for withholding are not sufficiently detailed, "in camera inspection may well be in order"). The record in this case contains clear evidence of bad faith conduct by the President of the United States in his attempt to interfere with a pending law enforcement investigation into his Administration. Under those circumstances, the Court does not owe blind deference to an otherwise implausible claim of exemption—particularly one asserted by an intelligence agency the President has attempted to use for his own benefit.

## CONCLUSION

For the foregoing reasons, this Court should grant plaintiffs summary judgment and order the NSA to produce any records responsive to plaintiff's Second Amended Request.

Respectfully submitted,

Date:  June 25, 2018

/s/ *Michael P. Abate*

Michael P. Abate
  (DDC Bar No. MD28077)
  (DC Bar No. 1023343)
Kaplan Johnson Abate & Bird LLP
710 W. Main St., 4th Floor
Louisville, KY 40202

Benjamin L. Berwick (MA Bar No. 679207)
Counsel
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
Phone: 202-599-0466
Fax: 929-777-8428

*Counsel for Plaintiff*