IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE PROTECT DEMOCRACY PROJECT, <br> Plaintiff, <br><br> v. <br><br> THE NATIONAL SECURITY AGENCY, *et al.* <br> Defendants. | No. 1:17-CV-1000-CKK |

## **DECLARATION OF LINDA M. KIYOSAKI**

I, LINDA M. KIYOSAKI, hereby declare and state:

1. I am currently the Acting Chief of Policy, Information, Performance, and Exports at the National Security Agency ("NSA" or "Agency"), an intelligence agency within the Department of Defense. I am also the Deputy Chief of this organization. I have been employed with NSA since 1985. I am responsible for oversight of NSA's Freedom of Information Act/Privacy Act Office. This office has primary responsibility for responding to requests for NSA records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Prior to this assignment, I have held various leadership positions throughout the Agency and I have a detailed understanding of NSA's operations, management processes, and resources. My positions include serving as the Senior Intelligence Analysis Authority, the Associate Director for Strategy, Programs and Performance for the Mission Management Investment Portfolio, an NSA representative to CIA's Counterterrorism Center, an NSA representative to the FBI, and the Enterprise Engagement and Mission Management Associate Director.

2. The Chief of Policy, Information, Performance, and Exports has TOP SECRET original classification authority pursuant to Section 1.3 of Executive Order ("E.O.") 13526. This Executive Order allows for classification of information whose unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security that pertains to, among other categories of information, intelligence activities, intelligence sources or methods, or cryptology. *See* E.O. 13526 § 1.4(c), dated 29 December 2009 (75 Fed. Reg. 707). While acting in this position, it is my responsibility to assert the FOIA exemptions over NSA information in the course of litigation.

3. Through the exercise of my official duties, I am personally familiar with document at issue in this case. The statements contained in this declaration are based on my personal knowledge and review of the document in question, upon information provided to me in my official capacity, and on conclusions and determinations reached and made in accordance therewith.

4. This declaration explains NSA's position with respect to Plaintiff's amended request for the memorandum written by NSA's former Deputy Director Ledgett ("the Ledgett memo") which documented a call by the President of the United States to NSA's former Director Rogers on March 26, 2017. In the previous declaration in this matter signed by Steven E. Thompson on August 9, 2018, the Agency explained NSA's original *Glomar* response with respect to the Ledgett memo. In light of references to the Ledgett memo in the redacted version of the Mueller report, NSA has withdrawn its *Glomar* response. NSA is now denying the request for the Ledgett memo in its entirety pursuant to pursuant to Exemptions 1, 3, 5, and 6 of the FOIA.[1]

---

[1] 5 U.S.C. § 552(b)(1), (3), (5), and (6).

2

## ORIGIN AND MISSION OF NSA

5. The NSA was established by Presidential Directive in October 1952 as a separately organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense. NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information, for foreign intelligence and counterintelligence purposes to support national and departmental missions to include the conduct of military operations. *See* E.O. 12333, section 1.7(c), as amended.

6. Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world. Moreover, intelligence produced by NSA is often unobtainable by other means.

7. As a member of the Intelligence Community ("IC"), the Director of NSA reports to the Director of National Intelligence ("DNI"), who serves as the head of the IC and acts as the "principal adviser to the President, to the [National Security Council], and to the Homeland Security Council for intelligence matters related to national security."[2] Congress created the position of the DNI in the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1101(a) and 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (IRTPA) (amending Sections 102 through 104 of Title 1 of the National Security Act of 1947). The responsibilities and authorities of the DNI are set forth in the National Security Act of 1947, as

---

[2] E.O. 13470 of July 30, 2008 (further amendments to E.O. 12333, United States Intelligence Activities).

amended. These responsibilities include ensuring that national intelligence is provided to the President, heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. 50 U.S.C. § 3024(a)(1). The DNI is charged with establishing the objectives of; determining the requirements and priorities for; and managing and directing the tasking, collection, analysis, production, and dissemination of national intelligence by elements of the IC. 50 U.S.C. §§ 3024(f)(1)(A)(i) and (ii). Accordingly, a major part of NSA's functional role is, in coordination with the DNI, to provide the foreign intelligence it is charged with collecting to principals in government, among them the President.

8. NSA's ongoing ability to produce the SIGINT information upon which senior executive branch officials, including the President, rely for intelligence depends on its continued access to foreign signals. Further, SIGINT capabilities are both expensive and fragile. Public disclosure of either the capability to collect specific signals or the substance of the SIGINT information itself can easily alert foreign adversaries to the vulnerability of their signals.

9. Information obtained from intercepted foreign communications is called communications intelligence ("COMINT"), a subset of SIGINT information. NSA's COMINT efforts constitute only part of the functions and activities of the Agency. A fundamental tenet of the COMINT process is that the identity of specific communicants whose communications are intercepted (commonly referred to as "targets"), the degree of success in exploiting these targets, and the vulnerability of particular foreign communications are all matters that must be maintained in strictest secrecy because of the fragility of the ability to exploit foreign communications. Once alerted, COMINT targets may change the way they communicate,

which could inhibit access to the target's communications, and therefore, deny the United States access to information crucial to the defense of the United States, both at home and abroad. If a target is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of that target's signals, which may never again occur. If a source becomes unavailable, the military, national policymakers, combatant commanders, and the IC must operate without the information the signals provided. Such losses are extremely harmful to the national security of the United States.

10.     Congress has specifically recognized the inherent sensitivity of the SIGINT activities of the NSA; thus, Congress has passed statutes to protect the fragile nature of NSA's SIGINT efforts. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power or terrorist party and the significance of the loss of valuable foreign intelligence information to national policymakers, combatant commanders, and the IC. One such statute, applicable here, Section 6 of the National Security Agency Act of 1959 (codified at 50 U.S.C. § 3605), specifically authorizes NSA to protect certain information concerning its activities and its intelligence sources and methods from public disclosure.

## PLAINTIFF'S FOIA REQUEST

11.     While the original FOIA request submitted by Plaintiff the Protect Democracy Project ("PDP" or "Plaintiff") on 21 April 2017 was extremely broad, the parties submitted a joint status report and proposed schedule on 25 October 2017, by which they agreed to narrow Plaintiff's original FOIA request. ECF No. 16. Pursuant to the Court's scheduling order of 4 December 2017, NSA made its first production of responsive documents to Plaintiff on 20 December 2017, producing one page of responsive material.

12. In early 2018, following that production, Plaintiff proposed a further narrowing of its FOIA request, seeking the following records specifically from NSA (the "Amended Request"):

> [A]ny memoranda (and, as noted below, associated documents) written by senior NSA officials documenting a conversation between White House personnel, including the President, and NSA senior officials, including Adm. Rogers, in which the White House asked the NSA to publicly dispute any suggestion of collusion between Russia and the Trump campaign.

Citing news reports, Plaintiff elaborated that its request was for NSA to:

> [P]romptly locate and process any records documenting or referencing any such phone call between the President (or senior advisers) and Adm. Rogers (or senior advisers). This includes, but is not limited to, the above-referenced memoranda; any communications forwarding, responding to, or discussing that memoranda; or any other document describing any conversations in which White House officials asked NSA officials to publicly dispute the suggestion of any collusion between Russia or Russian nationals and the Trump campaign.

13. On 20 March 2018, NSA provided its final response to Plaintiff's Amended Request, agreeing to the modification of the original request and providing a *Glomar* response, declining to confirm or deny the existence of responsive records pursuant to Exemption 3 of the FOIA.

14. On 18 April 2019, the Department of Justice released a redacted version of the Mueller Report. Included on pages 55-57 of Volume II is a description of the call made by President Trump to NSA's then-Director Rogers on 26 March 2017. Also included is a reference to the memorandum prepared by NSA's then-Deputy Director Richard Ledgett documenting the content of the conversation. Given the release of this information by the Department of Justice in the redacted version of the Mueller Report, NSA has withdrawn its original *Glomar* response regarding the Ledgett memo. Although NSA has withdrawn its

*Glomar* response, for the reasons set forth in detail below, the Agency is withholding the document in its entirety.

## **THE RECORD SOUGHT IS PROTECTED FROM DISCLOSURE UNDER FOIA EXEMPTIONS 1, 3, 5 AND 6**

15. As noted above, the document at issue is the Ledgett memo documenting the content of the call between President Trump and NSA's then-Director Rogers. Information in the document is withheld pursuant to Exemptions 1, 3, 5 and 6 of the FOIA, as further detailed below. Based on my position as the Acting Chief of Policy, Information, Performance, and Exports, the Agency official responsible for the processing of all requests made pursuant to FOIA, I am confident in NSA's determination that the withheld information is exempt from disclosure pursuant to the FOIA.

### FOIA Exemption 1

16. Section 552(b)(1) of the FOIA exempts from disclosure matters that are specifically authorized—under criteria established by an Executive Order—to be kept secret in the interest of the national defense or foreign policy. The current Executive Order that establishes such criteria is E.O. 13526.

17. Section 1.1 of E.O. 13526 provides that information may be originally classified if: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the government; (3) the information falls within one or more of the categories of information listed in section 1.4 of the Executive Order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, and the original classification authority is able to identify or describe the damage.

18. Section 1.4 of E.O. 13526 provides that information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information. In particular, Section 1.4(c) includes intelligence activities, intelligence sources and methods, or cryptology. Disclosure of the withheld information would reveal information related to this category that is currently and properly classified as set forth in Section 1.4(c) of E.O. 13526.

19. The release of the materials withheld in part under Exemption 1 would disclose information that is currently and properly classified TOP SECRET pursuant to Section 1.2(a)(1) and (2) of E.O. 13526, because the information could reasonably could be expected to cause exceptionally grave damage to the national security. Any disclosure of this information would obviously and immediately affect the ability of NSA to counter threats to the national security of the United States.

20. In my role as a TOP SECRET original classification authority ("OCA"), I am authorized to make classification decisions at the TOP SECRET, SECRET, and CONFIDENTIAL levels. I reviewed the information withheld under Exemption 1 pursuant to this FOIA request and determined that this information is currently and properly classified in accordance with E.O. 13526. The information withheld under Exemption 1 contains specific classified information concerning NSA intelligence activities and capabilities, which plainly cannot be released to the public without causing serious damage to national security. If adversaries were aware of NSA's capabilities, they would likely change their communications methods to evade collection, which could undermine NSA's entire mission.

### FOIA Exemption 3

21.     Section 552(b)(3) exempts from disclosure matters that a statute requires be withheld from the public in such a manner as to leave no discretion on the issue, establishes particular criteria for withholding, or refers to particular types of matters to be withheld. *See* 5 U.S.C. § 552(b)(3). Review of the application of this section of the FOIA consists solely of determining that the statute relied upon qualifies as an exempting statute under Exemption 3 and that the information withheld falls within the scope of the statute. No showing of national security harm is required in order to maintain a proper exemption pursuant to Exemption 3.

22.     The information withheld in full here is protected from disclosure by several statutes. First and foremost, the document contained general information about NSA's intelligence activities and procedures. Such material plainly falls within NSA's unique statutory privilege: Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605. As noted above, Section 6 is a statutory privilege unique to NSA and provides that "nothing in this chapter or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or the names, titles, salaries, or number of the persons employed by such agency." By this language, Congress expressed its finding that disclosure of any information relating to NSA organization, function, activities, and personnel is potentially harmful. The protection provided by this statute is, by its very terms, absolute, as Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities. Further, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege; rather, NSA need only to show that the information falls within the scope of Section 6. NSA's organization, function,

activities, and nonpublic personnel are therefore protected from disclosure regardless of whether or not the information is classified.

23.  Here, the document contains general information about NSA's intelligence activities and procedures. Such information is properly withheld because it is contained within the ambit of Section 6, and, accordingly, protected from disclosure by Exemption 3, which safeguards such specific, statutory privileges.

24.  In addition to Section 6 of the NSA Act, some of the information withheld is protected from disclosure by 18 U.S.C § 798. This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communication intelligence activities of the United States, or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government. The term "communication intelligence," as defined by Section 798, means the "procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients." 18 U.S.C. § 798(b). As noted above, some of the withheld material implicates specific targets and methods of NSA's foreign intelligence activities. This material, while classified, is also plainly protected by the strictures of § 798. This statutory scheme underscores Congress' commitment to protecting communication intelligence, which is central to NSA's mission, from disclosure. Here, given the classified nature of the withheld material, as well as its reflection of NSA's core activities, it is axiomatic that disclosure of the withheld information about this intelligence source (communication intelligence) and the related methods used to secure it, would reveal critical information about the means through which NSA collects and processes communication intelligence, plainly falling within the scope of this statutory scheme.

25. Finally, the withheld material is protected from disclosure by Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 3024, which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." NSA, as an element of the IC, must also protect intelligence sources and methods. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute. Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 3024. Detailed discussions about NSA capabilities reflect the very sources and methods this statute is designed to protect.

26. Based upon my review, I have concluded that portions of the document are exempt from disclosure by the fact that these portions are plainly protected from release by the aforementioned three statutes: (1) Section 6, 50 U.S.C. § 3605, because the withheld information concerns the core function and/or activities of NSA; (2) 18 U.S.C. § 798, because disclosure could reveal classified information derived from NSA's exploitation of foreign communications; and/or (3) Section 102A(i)(1), 50 U.S.C. § 3024, because the information concerns intelligence sources and methods. For these reasons, some portions of the document are protected from disclosure pursuant to Exemption 3.

### FOIA Exemption 5: Presidential Communications Privilege

27. The Presidential communications privilege protects confidential communications or documents that relate to potential Presidential decision-making that involve the President or his senior advisors. This privilege preserves the President's ability to obtain frank and informed opinions from his advisors and to make decisions in confidence. The Ledgett memo summarizes the details of a phone call on 26 March 2017 between President

Trump and NSA's then-Director Rogers. Specifically, the document describes a conversation regarding foreign affairs and national security, implicating potential Presidential decision-making. Because the information withheld here under the exemption reflects the details of a communication that directly involved the President and one of his senior advisors, the Director of NSA, was wholly internal the Executive Branch, and involves potential Presidential decision-making, the information is properly withheld pursuant to the Presidential communications privilege encompassed by FOIA Exemption 5. Compelled disclosure of a communication between the President and the Director of NSA could threaten the quality of presidential decision-making by impairing the deliberative process in which those decisions are made.

28. This privilege was not waived by the redacted version of the Mueller report released publicly on 18 April 2019. Unlike the document at issue here, the redacted Mueller report does not disclose the statements made by President Trump or NSA's then-Director Rogers during the phone call. Further, the memo addresses topics of conversation not described in the Mueller report, to include NSA intelligence information with the potential to influence presidential decision-making regarding foreign affairs and national security. The information in the Ledgett memo withheld pursuant to Exemption 5 includes the topics of conversation, specific details of the conversation between President Trump and then-Director Rogers, and information with related to presidential decision-making, going beyond what is contained in the Mueller report. This information remains protected by the Presidential communications privilege.

### FOIA Exemption 6

29. Lastly, § 552(b)(6) of the FOIA protects from disclosure information whose release would lead to a clearly unwarranted invasion of personal privacy. The information

withheld under this exemption protects the personal privacy (i.e., signature) of NSA former-Deputy Director Ledgett.

## CONCLUSION

Based on my review of the Ledgett memo, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed, this 27th day of August 2019 pursuant to 28 U.S.C. § 1746.

LINDA M. KIYOSAKI
Acting Chief, Policy, Information,
Performance, and Exports
National Security Agency