# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE PROTECT DEMOCRACY PROJECT,
INC.,

       Plaintiff,

   v.

U.S. NATIONAL SECURITY AGENCY,

      Defendant.

Civil Action No. 17-1000 (CKK)

## MEMORANDUM OPINION
(March 23, 2020)

This lawsuit arises from a Freedom of Information Act ("FOIA") request that Plaintiff The Protect Democracy Project, Inc. (the "Project") made to Defendant United States National Security Agency ("NSA") in 2017. Pending before the Court are Defendant's Motion for Summary Judgment, ECF No. 34, and Plaintiff's Cross-Motion for Summary Judgment, ECF No. 35.

NSA has withheld a responsive document referred to as the Ledgett Memorandum, which was drafted by Rick Ledgett, the former Deputy Director of the NSA. NSA primarily argues that the Ledgett Memorandum was appropriately withheld under FOIA Exemption 5 because it is protected by the presidential communications privilege. It further argues that FOIA Exemptions 1, 3, and 6 also justify withholding specific portions of the Memorandum. In response, the Project argues that the presidential communications privilege does not extend to the Ledgett Memorandum and, moreover, that NSA has officially disclosed the information requested here. The Project also contests NSA's withholding of information under Exemptions 1, 3, and 6.

The Court agrees with NSA that the Ledgett Memorandum was appropriately withheld under FOIA Exemption 5. The Court has further determined, after *in camera* review of the Ledgett Memorandum, that the information officially disclosed to the public does not satisfy the strict test

1

for official acknowledgement or disclosure. Accordingly, upon consideration of the briefing,[1] the relevant legal authorities, the withheld document, and the record as it currently stands, the Court **GRANTS** NSA's Motion for Summary Judgment and **DENIES** the Project's Cross-Motion for Summary Judgment.

## I. BACKGROUND

The Project first sent a FOIA request to NSA seeking several categories of documents relating to contacts between NSA and others relating to potential Russian involvement in the 2016 national election. Pl.'s Stmt. ¶ 50; Def.'s Stmt. ¶ 1. In particular, one category of documents sought was:

> All records, including but not limited to emails, notes, and memoranda, reflecting, discussing, or otherwise relating to communications between the National Security Agency and the Executive Office of the President regarding contacts between individuals connected with the Russian government and individuals connected with the Trump campaign or the Trump administration, and/or Russian involvement with, or attempts to influence or interfere with, the national election of November 2016.

Pl.'s Stmt. ¶¶ 50–51; Def.'s Stmt. ¶ 1.

---

[1] The Court's consideration has focused on the following:
- Def.'s Mot. for Summ. J. and Def.'s Mem. of P. & A. in Supp. of Its Mot. for Summ. J. ("Def.'s Mot."), ECF No. 34;
- Def.'s Stmt. of Material Facts as to Which There Is No Genuine Issue ("Def.'s Stmt."), ECF No. 34;
- Decl. of Linda M. Kiyosaki ("Kiyosaki Decl."), ECF No. 34-1;
- Pl.'s Opp'n to Def.'s Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 35;
- Pl.'s Stmt. of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Pl.'s Stmt."), ECF No. 35-1;
- Def.'s Reply in Supp. of Its Mot. for Summ. J. and Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s Reply"), ECF No. 37;
- Decl. of Steven E. Thompson ("Thompson Decl."), ECF No. 37-1; and
- Pl.'s Reply Brief in Supp. of Cross-Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 39.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision. *See* LCvR 7(f).

Plaintiff filed the instant lawsuit on May 24, 2017. Pl.'s Stmt. ¶ 52 (citing Compl, ECF No. 1); Def.'s Stmt. ¶ 4. Plaintiff amended its Complaint on August 7, 2017. Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 53. Plaintiff thereafter narrowed its request in early 2018 to "memoranda," and any associated documents, that were "written by senior NSA officials" and "documenting a conversation between White House personnel, including the President, and NSA senior officials, including Adm. Rogers, in which the White House asked the NSA to publicly dispute any suggestion of collusion between Russia and the Trump campaign." Def.'s Stmt. ¶¶ 8–9; Pl.'s Stmt.¶¶ 55–57. NSA provided a final response to this request on March 20, 2018, which included a *Glomar* response in which the agency declined to confirm or deny the existence of responsive records pursuant to FOIA Exemption 3. Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶¶ 57–59. The parties later briefed cross-motions for summary judgment relating to the *Glomar* response. Pl.'s Stmt. ¶¶ 60–65; Def.'s Stmt. ¶ 10; *see also* ECF Nos. 23–28 (original summary judgment briefing).

Before the Court could rule on those motions, however, the Department of Justice released a partially redacted report drafted by Special Counsel Robert Mueller (the "Mueller Report"). Def.'s Stmt. ¶¶ 11–12; Pl.'s Stmt. ¶ 66. Volume II of the Mueller Report described a document that appeared to be responsive to the Project's Second Amended FOIA Request. Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶¶ 45–48. The relevant portion of the Report reads:

> On March 26, 2017, the day after the President called [Director of National Intelligence Daniel] Coats, the President called NSA Director Admiral Michael Rogers. The President expressed frustration with the Russia investigation, saying that it made relations with the Russians difficult. The President told Rogers "the thing with the Russians [wa]s messing up" his ability to get things done with Russia. The President also said that the news stories linking him with Russia were not true and asked Rogers if he could do anything to refute the stories. Deputy Director of the NSA Richard Ledgett, who was present for the call, said it was the most unusual thing he had experienced in 40 years of government service. **After the call concluded, Ledgett prepared a memorandum that he and Rogers both signed documenting the content of the conversation and the President's request, and they placed the memorandum in a safe.** But Rogers did not perceive the

President's request to be an order, and the President did not ask Rogers to push back on the Russia investigation itself. Rogers later testified in a congressional hearing that as NSA Director he had "never been directed to do anything [he] believe[d] to be illegal, immoral, unethical or inappropriate" and did "not recall ever feeling pressured to do so."

*Report on the Investigation into Russian Interference in the 2016 Presidential Election*, *available at* https://www.justice.gov/storage/report.pdf, at 268–69 (emphasis added) (footnotes omitted).[2]

Following the release of the Mueller Report, NSA withdrew its *Glomar* response. Def.'s Stmt. ¶ 16; Pl.'s Stmt. ¶ 68; Notice of Withdrawal of *Glomar* Response, ECF No. 31. NSA disclosed that it had located one responsive record that it had withheld under FOIA Exemption 5 as well as FOIA Exemptions 1, 3, and 6. Pl.'s Stmt. ¶ 69 (citing Joint Status Report, ECF No. 32); Def.'s Stmt. ¶ 18 (citing same). The parties then submitted cross-motions for summary judgment with respect to NSA's withholding of the Ledgett Memorandum. Upon review of the briefing and record, the Court previously determined in its March 6, 2020 Memorandum Opinion and accompanying Order, which it incorporates and makes a part of its opinion here, that *in camera* review was required for a responsible de novo determination on the claims of exemption. *See* Mar. 6, 2020 Order, ECF No. 41; Mar. 6, 2020 Mem. Op., ECF No. 42. The Court has since reviewed the Ledgett Memorandum *in camera*.

## II. LEGAL STANDARD

Congress passed FOIA to "'open[] up the workings of government to public scrutiny' through the disclosure of government records." *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984) (quoting *McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095, 1108 (D.C. Cir. 1983)). Congress, however, also recognized "that there are some government records for

---

[2] The page numbers referenced here are the page numbers of the entire report, which is in Portable Document Format ("PDF") and is not consecutively paginated. This quotation is found on pages 56–57 of Volume II.

which public disclosure would be so intrusive—either to private parties or to certain important government functions—that FOIA disclosure would be inappropriate." *Id.* To that end, FOIA "mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Despite these exemptions, "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). The exemptions are therefore "'explicitly made exclusive' and must be 'narrowly construed.'" *Milner*, 562 U.S. at 565 (citations omitted) (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 79 (1973); *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 630 (1982)).

When presented with a motion for summary judgment in this context, the court must conduct a de novo review of the record. 5 U.S.C. § 552(a)(4)(B). This requires the court to "ascertain whether the agency has sustained its burden of demonstrating the documents requested are . . . exempt from disclosure under the FOIA." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (internal quotation marks omitted). "An agency may sustain its burden by means of affidavits, but only 'if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Id.* at 1227 (quoting *Gallant v. Nat'l Labor Relations Bd.*, 26 F.3d 168, 171 (D.C. Cir. 1994)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011). "Uncontradicted, plausible affidavits showing

reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011).

Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

NSA first argues that the Ledgett Memorandum was properly withheld under FOIA Exemption 5, which incorporates the presidential communications privilege. In response, the Project argues that the presidential communications privilege does not extend to the Memorandum for three main reasons.[3] First, it argues that the Memorandum does not reflect presidential decision-making because its purpose "was to document a conversation in which the President made an inappropriate attempt to enlist the NSA Director to publicly undermine the FBI's ongoing investigation of the President's campaign and administration." Pl.'s Mot. at 12. Second, it argues that disclosure is warranted due to the serious allegations of wrongdoing by the President. Lastly, it contends that the disclosure of the information in the Ledgett Memorandum in the Mueller Report precludes invocation of the privilege. The Court considers each of these arguments in turn.[4]

---

[3] The Project also argued that the government failed to adequately justify its assertion of the presidential communications privilege in the affidavits it submitted. *See* Pl.'s Mot. at 18–20. That argument, however, focused primarily on the assertions in the declarations and suggested that the Court review the Ledgett Memorandum *in camera*. As the Court has done just that, and as it bases its decision not only on the briefing and submissions by the parties but also on its *in camera* review of the Memorandum, the Court does not dwell on this argument here.

[4] Because the Court determines that the Ledgett Memorandum was properly withheld under FOIA Exemption 5, it does not reach the parties' arguments with respect to other FOIA exemptions except to address some concerns related to the inclusion of classified information in the Memorandum.

A. The Presidential Communications Privilege and Presidential Decision-Making

The chief determination to be made is whether the Ledgett Memorandum qualifies for the presidential communications privilege under FOIA Exemption 5. Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "To qualify [for this exemption], a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Over the years, it has been construed as protecting "those documents, and only those documents, normally privileged in the civil discovery context." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Available privileges include the presidential communications privilege. *Judicial Watch, Inc. v. U.S. Dep't of Defense* (*Judicial Watch II*), 913 F.3d 1106, 1109 (D.C. Cir. 2019).

That privilege ensures that the President can receive "frank and informed opinions from his senior advisers" who may otherwise "'be unwilling to express [those views] except privately.'" *Id.* at 1110 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The shelter of this privilege is "properly invoked with respect to 'documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential.'" *Id.* at 1111 (quoting *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997)). And it can be invoked by not only the President, but also his advisors, to insulate their communications "'in the course of preparing advice for the President . . . even when these communications are not made directly to the President.'" *Id.* (alteration in original) (quoting *In re Sealed Case*, 121 F.3d at 751–52). The standard is whether the documents were "'solicited and received' by the President or his

7

immediate White House advisers who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Judicial Watch, Inc. v. Dep't of Justice (Judicial Watch I)*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (quoting *In re Sealed Case*, 121 F.3d at 752). This privilege "'should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected.'" *Id.* at 1116 (quoting *In re Sealed Case*, 121 F.3d at 752).

"Unlike the deliberative process privilege . . . the presidential communications privilege . . . 'applies to documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.'" *Id.* at 1113–14 (quoting *In re Sealed Case*, 121 F.3d at 745). Moreover, "[a]lthough the presidential communications privilege is a qualified privilege, subject to an adequate showing of need, FOIA requests cannot overcome the privilege because 'the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure.'" *Judicial Watch II*, 913 F.3d at 1112 (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 40 (D.C. Cir. 2008)).

The Project does not dispute that the Ledgett Memorandum memorializes a conversation between the former NSA Director and the President. *See, e.g.*, Pl.'s Stmt. ¶¶ 45–48 (outlining Mueller Report's description of relevant call and resulting memorandum). Instead, the Project asserts that the privilege "only applies to communications intended to advise the President on some aspect of *his* decision-making," and not when "the government is attempting to hide evidence of wrongdoing by a President that was so substantial the Special Counsel highlighted it as an example of potential obstruction of justice." Pl.'s Mot. at 13. In short, it contends that there is no connection between the Ledgett Memorandum and direct decision-making by the President. *See, e.g., id.* at 15.

In support of its withholding, NSA advances that the subject of the telephone call was "a conversation regarding foreign affairs and national security, implicating potential Presidential decision-making." Kiyosaki Decl. ¶ 27; *see* Def.'s Mot. at 10–11. The second declaration submitted by the agency explains that "Admiral Rogers provided the President with information and analysis based on specific NSA intelligence—and on his expertise as the director of an intelligence agency and as a senior military officer—in the context of a conversation related to national security and foreign affairs." Thompson Decl. ¶ 13. Accordingly, NSA argues, the memoranda memorializes a conversation that was "generated in the course of advising the President in the exercise of" his powers relating to foreign relations and intelligence-gathering activities. Def.'s Mot. at 12 (internal quotation marks omitted).

The Project's argument that "[t]here is no plausible nexus between the Ledgett Memorandum" and direct presidential decision-making, Pl.'s Mot. at 15, is unsupported by the Court's *in camera* review of the document.

However, the Court notes a seeming discrepancy between the declarations submitted by the Government and the Ledgett Memorandum itself. The declarations submitted by the Government suggest that the Memorandum concerns multiple distinct topics related to foreign relations and national security. *See, e.g.*, Kiyosaki Decl. ¶ 27; Thompson Decl. ¶ 12. That is not the case. While the Memorandum concerns several topics, all are directly related to a central set of interrelated issues. Without *in camera* review of the Memorandum, the Court would have held a distinctly different impression of what the Memorandum contained. This discrepancy is concerning, especially as courts routinely rely upon declarations in the FOIA context to determine whether documents were properly withheld.

Regardless, the Court's *in camera* review of the Ledgett Memorandum demonstrates that the conversation memorialized in the Memorandum involved advice solicited by, and provided to, the President that directly related to presidential decision-making with respect to foreign relations and intelligence-gathering activities. Such decisions are important presidential functions, and deliberations about these decisions and activities are among those principally protected by the presidential communications privilege. *See, e.g.*, *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 447 (1977) (describing President's "more particularized and less qualified privilege relating to the need to protect military, diplomatic, or sensitive national security secrets" (internal quotation marks omitted)). At bottom, the Ledgett Memorandum is a document "that reflect[s] presidential . . . deliberations and that the President believes should remain confidential." *Judicial Watch II*, 913 F.3d at 1113 (internal quotation marks omitted). "Disclosure of the [Ledgett Memorandum] would reveal the President's deliberations." *Id.*

Indeed, the U.S. Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit") has previously found that similar notes and memoranda memorializing meetings and telephone calls with a nexus to presidential decision-making are protected from disclosure by the presidential communications privilege. In *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997), for example, the D.C. Circuit found that documents "authored by the White House Counsel, Deputy White House Counsel, Chief of Staff and Press Secretary" that "were communications connected to an official matter on which they were directly advising the President" were protected by the privilege. *Id.* at 758. Also protected were notes taken at meetings attended by the advisers and connected to presidential decision-making, as the "notes reflect[ed] these advisers' communications." *Id.*

The D.C. Circuit also considered a similar document in its recent opinion in *Judicial Watch II*. There, the D.C. Circuit considered, among other things, the withholding of "information related

to memoranda regarding the capture or killing of Osama bin Laden in 2011," including five memoranda authored by various presidential advisers. *Judicial Watch II*, 913 F.3d at 1109. The Court found that these documents were protected from disclosure, as the decision at issue required the President to exercise his informed judgment as Commander in Chief "on a highly sensitive subject with serious direct and collateral consequences for foreign relations that required a high degree of protection for 'the President's confidentiality and the candor of his immediate White House advisors.'" *Id.* at 1111 (quoting *Judicial Watch I*, 365 F.3d at 1123). The court further rejected the argument that because the documents were memoranda memorializing analysis and advice provided to the President, and were therefore likely "prepared after the briefing," they were not protected. *See id.* at 1112–13. The memoranda at issue here, drafted by the former Deputy Director of the NSA and memorializing a conversation between the then-Director of the NSA and the President involving advice and deliberations regarding national security and intelligence-gathering decisions, is similarly protected by the privilege.

At various points in its briefing, the Project suggests that the Court should consider whether portions of the Ledgett Memorandum that were possibly unrelated to presidential decision-making can be withheld under FOIA Exemption 5. In general, the presidential communications privilege extends to documents in their entirety. *See Judicial Watch I*, 365 F.3d at 1113–14. The Project first suggested in its cross-motion that the Court may perform a segregability analysis under *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). Pl.'s Mot. at 16. Moreover, in its Reply, the Project also suggested that the general principle of non-segregability in this context should not hold true when some of the contents of a withheld document have been officially acknowledged or disclosed. *See, e.g.*, Pl.'s Reply at 5 n.2 (arguing that construing presidential communications privilege narrowly when part of document has been acknowledged means that privilege cannot

extend to entire document). The Court considers this argument both in the context of the privilege more generally and, below, in the context of the disclosure doctrine.

To begin with, *In re Sealed Case* does not support that a segregability analysis is appropriate for documents otherwise protected by the presidential communications privilege in the FOIA context. In that case, which involved efforts to compel performance of a subpoena *duces tecum*, the D.C. Circuit explained that the presidential communications privilege "is qualified, not absolute, and can be overcome by an adequate showing of need." 121 F.3d at 745. It further stated that "[i]f a court believes that an adequate showing of need has been demonstrated, it should then proceed to review the documents *in camera* to excise non-relevant material. The remaining relevant material should be released." *Id.* The Project, in its cross-motion, suggests that the need is great here. *See* Pl.'s Mot. at 16–17. This argument overlooks, however, that the D.C. Circuit has specifically explained that the need can never be great enough in FOIA cases:

> Although the presidential communications privilege is a qualified privilege, subject to an adequate showing of need, **FOIA requests cannot overcome the privilege** because "the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure," *Loving*, 550 F.3d at 40 (quoting *In re Sealed Case*, 121 F.3d at 737 n.5).

*Judicial Watch II*, 913 F.3d at 1112 (emphasis added). The analysis in *In re Sealed Case* is therefore unhelpful for the Project here.

Moreover, the D.C. Circuit has consistently explained that "[o]nce the privilege applies, the entirety of the document is protected." *Id.* at 1111; *see also, e.g.*, *Loving*, 550 F.3d at 37–38 ("The privilege covers documents reflecting presidential decisionmaking and deliberations, regardless of whether the documents are predecisional or not, and it covers the documents in their entirety." (internal quotation marks omitted)); *In re Sealed Case*, 121 F.3d at 745 ("In addition, unlike the deliberative process privilege, the presidential communications privilege applies to

documents in their entirety, and covers final and post-decisional materials as well as pre-deliberative ones.").  As the Court found above, the Ledgett Memorandum contains information protected by the presidential communications privilege.  The Court understands—and shares—the Project's concern that otherwise responsive and unprotected materials may be incorporated into a document with materials protected by the presidential communications privilege, thus rendering the entire document protected from disclosure.[5]  But, as the doctrine currently stands, the entire Memorandum here is protected from disclosure under the presidential communications privilege.

## B. Government Misconduct

The Project also appears to argue, in a short portion of its brief, that the Ledgett Memorandum cannot be withheld because it qualifies for a government wrongdoing or misconduct exception.  *See* Pl.'s Mot. at 17–18; *see also, e.g.*, Pl.'s Reply at 2 ("Simply put, this is a case about an extreme assertion of executive privilege intended to shield clear evidence of presidential wrongdoing that, according to the Special Counsel, would have been considered in normal circumstances to be evidence of possible obstruction of justice.").  Yet it is far from clear that any such exception may be properly invoked in a FOIA Exemption 5 case involving the presidential communications privilege.

The Project cites to *National Archives and Records Administration v. Favish*, 541 U.S. 157 (2004), and related cases to support this argument.  That case, however, involved "privacy concerns addressed by Exemption 7(c)" of FOIA.  *Id.* at 172.  The Supreme Court there found that when a FOIA requester demonstrates a public interest that is sufficient to overcome the privacy interest at stake in such cases, the government may be required to disclose the information.  *See*

---

[5] The Court ventures no opinion as to whether the portions of the Ledgett Memorandum directly referenced in the Mueller Report and primarily sought by the Project would, on their own, be protected by the presidential communications privilege if a segregability analysis were conducted.

*id.* In those cases, the requester must (1) "show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and (2) "must show the information is likely to advance that interest." *Id.* The Project also cites to *Roth v. U.S. Department of Justice*, 642 F.3d 1161 (D.C. Cir. 2011), which applies *Favish* in the same FOIA Exemption 7(c) context, *see id.* at 1178. The privacy concerns underlying Exemption 7(c) undoubtedly differ from those underlying Exemption 5 and the presidential communications privilege.

While the D.C. Circuit has yet to recognize such an exception in the Exemption 5 context, other courts in this circuit have found a government misconduct exception in the context of the deliberative process privilege. *See, e.g.*, *Reinhard v. Dep't of Homeland Sec.*, No. 18-cv-1449 (JEB), 2019 WL 3037827, at *11 (D.D.C. July 11, 2019) (referencing "government-misconduct exception to the deliberative-process privilege" and explaining that "any potential impropriety" must "rise[] to the level of 'extreme government wrongdoing' necessary to override this privilege" (quoting *Wisdom v. U.S. Tr. Program*, 266 F. Supp. 3d 93, 106 (D.D.C. 2017))); *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) ("Consistent with these cases, the Court here finds that the government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit."); *Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 102 F. Supp. 2d 6, 15 (D.D.C. 2000) ("It is true that 'where there is reason to believe the documents sought may shed light on government misconduct, the [deliberative process] privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government.'" (quoting *In re Sealed Case*, 121 F.3d at 738)); *cf. In re Sealed Case*, 121 F.3d at 738 (explaining that deliberative process privilege is routinely denied "where there is reason to

believe the documents sought may shed light on government misconduct" outside of FOIA context). *But see Judicial Watch, Inc. v. U.S. Dep't of State*, 241 F. Supp. 3d 174, 183 (D.D.C. 2017) ("Thus, the Court finds that the only applicable Circuit authority militates against recognizing a government misconduct exception in a FOIA case[.]"), *amended on other grounds on reconsideration by* 282 F. Supp. 3d 338 (D.D.C. 2017).

The Project has not cited to any of these cases, although it did cite to a Seventh Circuit case suggesting that such an exception may exist in the context of the deliberative process privilege. *See, e.g.*, *Enviro Tech Int'l, Inc. v. U.S. Envtl. Prot. Agency.*, 371 F.3d 370, 376 (7th Cir. 2004) (noting in dicta that "internal discussions about a course of agency action that would be nefarious, if not illegal, likewise would not be protected by the deliberative process privilege"). Nor has the Project cited to any case that specifically applies this exception in the context of the presidential communications privilege—or explained why the Court should recognize such an exception here, in a completely different context. *See* Pl.'s Mot. at 17–18.

In fact, D.C. Circuit precedent suggests that extension of the privilege to this context may be inappropriate. Most notably, in *In re Sealed Case*, the D.C. Circuit discussed briefly the government misconduct exception with respect to both the deliberative process privilege and the presidential communications privilege, albeit outside of the FOIA context. *See* 121 F.3d at 738, 746. At one point, the D.C. Circuit stated that:

> [W]hile both the deliberative process privilege and the presidential privilege are qualified privileges, the *Nixon* cases suggest that the presidential communications privilege is more difficult to surmount. In regard to both, courts must balance the public interests at stake in determining whether the privilege should yield in a particular case, and must specifically consider the need of the party seeking privileged evidence. But this balancing is more ad hoc in the context of the deliberative process privilege, and includes consideration of additional factors such as whether the government is a party to the litigation. **Moreover, the privilege disappears altogether when there is any reason to believe government misconduct occurred.**

**On the other hand, a party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need, even when there are allegations of misconduct by high-level officials**.  In holding that the Watergate Special Prosecutor had provided a sufficient showing of evidentiary need to obtain tapes of President Nixon's conversations, the Supreme Court made no mention of the fact that the tapes were sought for use in a trial of former presidential assistants charged with engaging in a criminal conspiracy while in office.  *Accord Senate Committee*, 498 F.2d at 731 (noting that presidential privilege is not intended to shield governmental misconduct but arguing that showing of need turns on extent to which subpoenaed evidence is necessary for government institution to fulfill its responsibilities, not on type of conduct evidence may reveal); *contra* 26A Wright & Graham, *supra*, § 5673, at 53–54 (quoting *Senate Committee*'s not-a-shield language and arguing that allegations of misconduct qualify the privilege, but not addressing *Senate Committee*'s comment that need showing turns on function for which evidence is sought and not on conduct revealed by evidence).

*Id.* at 746 (formatting altered, emphasis added, and footnote omitted); *see also id.* at 751 ("The risk of a chill increases, however, as the possibility of disclosure rises, especially if there are situations in which the privilege may virtually disappear, such as when government misconduct is alleged.  Nor does it suffice to respond that the public interest in honest and accountable government is stymied if presidential advisers are allowed even a qualified privilege when government misconduct is charged.").

There are several takeaways from this discussion.  First, the "differences between the presidential communications privilege and the deliberative privilege demonstrate that the presidential privilege affords greater protection against disclosure."  *Id.* at 746.  Moreover, while the D.C. Circuit suggested that (outside the FOIA context) the deliberative process privilege "disappears altogether" if "there is any reason to believe government misconduct occurred," it did not say the same in the context of the presidential communications privilege.  *See id.*  Instead, it focused on the requirement for showing an adequate need for the withheld documents, even when there are allegations of misconduct.  *See id.*  This focus, and the subsequent discussion and

citations, appear to suggest that any government misconduct exception does not apply in the same form—or with the same force—to the presidential communications privilege; it is instead part of the determination of whether there is a need sufficient to overcome the privilege. However, as noted above, the D.C. Circuit has found that no need can overcome the presidential communications privilege in the FOIA context "because the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure." *Judicial Watch II*, 913 F.3d at 1112 (internal quotation marks omitted). Together, these discussions suggest that it would be inappropriate to extend the government misconduct exception to the presidential communications privilege in a FOIA Exemption 5 context.

At bottom, in light of precedent (and the lack thereof), the Project's brief invocations of this exception without further explanation is insufficient to convince the Court that extending any potential government misconduct exception to this context is appropriate. Although the Court recognizes the Project's concern that withholding of documents may be used to shield government wrongdoing, the Court declines to extend the exception here.[6]

C. Official Disclosure or Acknowledgement

Lastly, the Project argues that the Ledgett Memorandum cannot be withheld under Exemption 5 because the information contained in it—or at least some of that information—has already been officially disclosed. *See* Pl.'s Mot. at 20–21. In particular, the Project contends that it "plainly the case here" that "the information sought by [the Project] matches the information already made public and is as specific as the information that has been made public to date." *Id.* at 20–21. The Project points to the description of the phone call between the President and the

---

[6] The Court therefore does not address whether, if a government misconduct exception did apply in this specific context, the wrongdoing alleged here would be sufficient to overcome the presidential communications privilege.

Director of the NSA in the Mueller Report and argues that official disclosure precludes NSA from withholding the Memorandum in full. *See id.*

In response, NSA argues that the Mueller Report is not specific enough to constitute disclosure because "it does not quote from or otherwise divulge the full contents of the communications between the President and Admiral Rogers." Def.'s Mot. at 13. The declarations submitted by NSA supported this assertion. *See* Kiyosaki Decl. ¶ 28; Thompson Decl. ¶ 12. Because the Mueller Report "describes only vaguely and only in part the contents of the Ledgett Memo," NSA contends, the Memorandum was not officially disclosed in full. Def.'s Mot. at 15. The Court agrees with NSA that the strict requirements of the official disclosure test are not satisfied here.

"If the government has officially acknowledged information, a FOIA plaintiff may compel disclosure of that information even over an agency's otherwise valid exemption claim." *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620 (D.C. Cir. 2011). Information must satisfy three criteria to qualify as officially acknowledged: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *Id.* at 620–21. But "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption." *Wolf v. C.I.A.*, 473 F.3d 370, 378 (D.C. Cir. 2007). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Id.* (emphasis in original). "The insistence on exactitude recognizes the

Government's vital interest in information relating to national security and foreign affairs." *Id.* (internal quotation marks omitted).

These requirements are not met here. As for the first and second requirements, the Project requests the Ledgett Memorandum either in full or in part. As the Court noted above, however, documents properly withheld under the presidential communications privilege are generally withheld or released in full. To address this hurdle in its request for only a portion of the Memorandum, the Project argues that the D.C. Circuit's language indicating that this privilege "must be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected," *Judicial Watch II*, 913 F.3d at 1111 (internal quotation marks omitted), must be squared with the official disclosure doctrine. This is done, the Project suggests, by allowing disclosure of a portion of the document. *See* Pl.'s Reply at 5 n.2. However, as the Court discussed at length above, this ignores consistent precedent. Accordingly, the Court rejects the Project's argument that part of the Ledgett Memorandum can be released via a segregability analysis.

The Court consequently considers the Project's request for the Ledgett Memorandum in full. As noted above, precedent on this topic indicates that there must be a close match between the information requested and the information disclosed in recognition of "the Government's vital interest in information relating to national security and foreign affairs." *Wolf*, 473 F.3d at 378 (internal quotation marks omitted). Indeed, in cases where disclosure of information is at issue, "the inquiry turns on the match between the information requested and the content of the prior disclosure." *Id.* In *Military Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981), for instance, the D.C. Circuit rejected the argument that disclosure of some information, which overlapped with the information sought, rendered all the information sought officially disclosed or acknowledged,

*see id.* at 752–53. And in *Fitzgibbon v. C.I.A.*, 911 F.2d 755 (D.C. Cir. 1990), the D.C. Circuit reversed the district court's finding that information about a particular CIA station should be disclosed as the information disclosed was about a different time period (in 1960 to 1961) than the time period in the request (dating back to 1956), *see id.* at 765–66.

In light of this precedent and the Court's *in camera* review of the Ledgett Memorandum, the information disclosed and released in the Mueller Report is not sufficiently specific. In other words, the information requested by the Project—the Ledgett Memorandum—is not as specific as the information previously disclosed and released in the Report. The Mueller Report's description of the phone call and resulting Memorandum is not as comprehensive as the Ledgett Memorandum itself; the Memorandum contains a significant amount of information that was not included in the Mueller Report. Even with respect to the information included in the Mueller Report, the Ledgett Memorandum contains more details.[7] The first and second requirements are therefore not met here. The Court thus rejects the Project's argument that the Ledgett Memorandum cannot be withheld on this basis.

## IV. CONCLUSION

The Court finds that the Ledgett Memorandum was properly withheld under the presidential communications privilege pursuant to FOIA Exemption 5. Accordingly, the Court **GRANTS** NSA's Motion for Summary Judgment, ECF No. 34, and **DENIES** the Project's Cross-Motion for Summary Judgment, ECF No. 35. An appropriate Order accompanies this

---

[7] While the Court does not address the parties' arguments with respect to classified information in depth, based on the Court's *in camera* review, release of the Ledgett Memorandum in full would also present concerns with respect to classified information. *See also* Kiyosaki Decl. ¶¶ 16–20; Thompson Decl. ¶¶ 9–10.

Memorandum Opinion. There are no claims remaining and therefore this case shall be **DISMISSED**.

Date: March 23, 2020

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge